FERGUSON, Judge.
Olrick Thomas was found guilty in a jury trial of false imprisonment and two counts of sexual battery on a child under the age of twelve. The issue presented in this State appeal from an order granting a new trial is whether the evidence relied upon by the defendant as a basis for a retrial satisfies the requirements of Florida Rule of Criminal Procedure 3.600(a)(3)[1] that such evidence be new and material, could not have been discovered and produced for trial, and would probably have changed the trial outcome. We hold that the defendant’s new evidence failed each prong of the test and reverse.
The defendant was charged with kidnapping and three charges of sexual battery upon a person less than twelve years of age. In April 1986 he entered a nolo con-tendere plea to the charges and was sentenced to life imprisonment. In accordance with standard procedures, physical evidence, consisting of blood and saliva samples of the defendant and victim, clothing and. other specimens taken from the crime scene, was destroyed due to space shortage in the evidence storage areas.[2]
On February 25, 1988 the defendant filed a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850. For reasons unrelated to this appeal, the motion was granted. The trial court entered an order vacating the judgment and sentence and granting the defendant a new trial.
Shortly before the commencement of the new trial, the prosecutor learned of the destruction of the physical evidence.[3] The defendant, who was also unaware that the samples had been destroyed, requested that a DNA test be performed. Upon learning that the DNA testing would take from six weeks to three months, the defendant elected to proceed to trial without the test results.
At trial, the eleven-year-old victim testified that on the day of the assault she was walking home from school with the defendant’s younger brother, Roscoe, and other schoolmates. Roscoe stopped to visit another friend and she continued home in the direction of the defendant’s house in her neighborhood. As she was passing his house, the defendant who was smoking a cigarette on the front porch, called her over. He grabbed her by the neck and hand, ignoring her pleas to be left alone. She was pulled into the house, dragged into a room, and “slammed” onto a bed. She screamed and yelled but was ordered to take her clothes off. She was slapped when she refused. A struggle ensued wherein she was dragged into a closet, her skirt ripped off, struck again, and finally thrown onto the bed a second time. The defendant’s younger brother entered the room and was told to leave.[4] The victim described in detail how the defendant had *1025 forced vaginal, digital, and oral intercourse with her. Throughout the assault she begged him to stop and screamed in pain but he threatened to kill her if she continued to cry out. The defendant turned up the volume on a radio to drown out her screams.
After the assault, the defendant allowed the victim to put on her clothes. He then instructed the child, whose father is a minister, to kneel with him for prayer. She was ordered to repeat after him “God, if I tell on Ork, don’t send me to heaven, send me to hell.” He hugged her and apologized for his actions. The victim went home a few houses away where she immediately told her fourteen-year-old sister what had happened.
Sergeant Crocker, one of the first police officers on the scene, testified that he responded to the victim’s home moments later and observed her lying on the bed, crying and holding her stomach. He had to assist her outside in order to make an identification of the defendant who had already been detained. She made the identification and was then transported to the Rape Treatment Center.
Dr. Aramis examined the victim at the center. He testified that after obtaining a history of the incident he conducted an examination. The left forehead area and the right side of the victim’s lower back were tender; the outside of the vagina was red and tender; the area of the hymen was also red and tender and had a small tear on the left side. The doctor testified that such tears in the hymen were usually only caused by the insertion of a penis or other object into the vagina. His examination concluded that the victim had engaged in forceful sex and that sperm was present in the vagina. The jury heard the results of serological tests which had been performed on many of the samples. They disclosed that the defendant, as well as fifty-five percent of the male population, could have committed the assault.
James McMillan, a friend of the defendant, testified that the defendant’s statement to the police that he was with him on the afternoon of the assault was untrue. McMillan testified that when the defendant called and asked him to provide an alibi, he informed the defendant that he had already told the police that he had not seen him. At trial the defendant, a twice-convicted felon, admitted that he had attempted to fabricate an alibi. His defense was essentially that the victim had engaged in consensual sex with his eleven-year-old younger brother.
In the course of trial, the victim was asked to identify photographs of the crime scene taken twenty-seven hours after the assault. When asked if she recognized the bedroom, bed, and sheets, the victim identified the room and furniture but could not identify the sheets. On cross-examination, defense counsel succeeded in extracting an admission from the victim that the sheets in the photograph were not the sheets that were on the bed at the time of the assault. Based on that statement, the defense counsel objected to any testimony concerning the sheets. In response the State agreed not to question the criminologist concerning tests performed on those sheets. Legal irrelevancy of the bedsheet sample and, for the same reason, immateriality, were established as a matter of fact and accord.
On November 3, 1988, after the jury returned its guilty verdict, the trial court granted the motion for a DNA analysis on the underpants and sheet samples that were still in the State’s possession. On September 1, 1989, the defendant, over a year after electing to go to trial without the DNA test results, filed a supplemental motion for a new trial alleging that post-trial tests conducted on the sheet established that the semen was that of some other individual. On September 9, 1989 the trial court entered the order granting a new trial which is the subject of this appeal.
The first prong of rule 3.600(a)(3) requires a showing that the new evidence is material. Here the victim testified at trial that she did not recognize the sheet and did not think that sheet was on the bed on the day of the assault. As pointed out by defense counsel, in arguing his objection at trial, any evidence concerning the sheet was not probative of the defendant’s guilt *1026 in light of the uncontradicted testimony that the sheet was not on the bed on the day of the assault. The semen found on the DNA-tested sheet could have been deposited at any time prior to, or after the assault. See O’Bryan v. State, 300 So.2d 323 (Fla. 1st DCA 1974) (newly discovered evidence that defendant’s blood type was really type “0” insufficient to warrant a new trial in that new evidence showed only that decedent had contact with a third-party at some time prior to contact with defendant); State v. Ford, 392 S.E.2d 781 (S.C. 1990) (while DNA test results meet general standard of acceptance in scientific community and thus are admissible on that basis, such tests may be inadmissible on grounds of relevancy).
The defendant could have obtained a continuance to await the results of the DNA tests which he now claims are newly discovered evidence. Instead he demanded a speedy trial pursuant to Florida Rule of Criminal Procedure 3.191, forcing the State to proceed to trial or to abandon the prosecution. Consistent with the defense strategy to create a reasonable doubt of guilt by featuring the absence of the available scientific evidence, the defendant, while on the witness stand, made a point of the fact that the State could have, but failed to conduct a DNA test on the bedsheet sample. As we interpret Rule 3.600(a)(3), scientific test data, the availability of which was known before trial, and which could have been obtained in a continuance of the trial for a reasonable period, is not newly discovered evidence for the purpose of a new trial.
Ordinarily, an accused will not be permitted to waive discovery as to specific evidence in favor of a speedy trial, use that absence of the evidence in presenting a defense, renew the discovery after suffering an adverse judgment, and obtain a new trial on grounds of newly obtained evidence. Here we distinguish between newly discovered evidence, which the rule contemplates, and newly obtained but earlier discoverable evidence, which the rule excludes. See Luster v. State, 262 So.2d 910 (Fla. 3d DCA 1972) (statement by defendant that there were exonerating witnesses did not constitute newly discovered evidence in absence of showing that the existence of such witnesses was not known to defendant prior to trial). No reason for applying a fundamental fairness exception to the rule is suggested by the facts. See State v. Coyne, 512 So.2d 221 (Fla. 2d DCA 1987) (new evidence would not affect outcome, fairness of the trial not impaired, and a new trial not warranted).
For reasons that the defendant’s DNA test result evidence was neither newly discovered nor material, the order granting a new trial is reversed.

. Rule 3.600 GROUNDS FOR NEW TRIAL
(a) The court shall grant a new trial if any of the following grounds is established: ******
(3) That new and material evidence, that if introduced at the trial would probably have changed the verdict or finding of the court, and that the defendant could not with reasonable diligence have discovered and produced upon the trial, has been discovered.

. The results of tests performed on the items were provided to the defendant. The record does not disclose that the defendant had made any attempts to view the samples or to conduct independent tests prior to trial. There was a finding by the trial court, which is not challenged, that there was no discovery violation or prejudice to the defendant as a result of the evidence destruction.

. Sometime during trial the defendant learned that the samples had been destroyed. The State and the defendant also learned, after trial was underway, that other crime-scene evidence, including a small piece of blood-stained bedsheet and a piece of the victim's underpants, had been preserved. There is no showing in the record, nor is a claim made here, that the defendant changed his decision to waive a DNA analysis of the sheet and undergarment.

. While the assault was occurring, the victim's sister called by telephone inquiring as to victim’s whereabouts as she was overdue at home. The defendant answered, saying that he had not seen the victim, but that he would send her home if she happened to stop by.